UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CEDRIC WAYNE JACKSON, SR. ET AL. | CIVIL ACTION NO. 09-421 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| SUPREME CORP., ET AL. | MAGISTRATE JUDGE HORNSBY |

### MEMORANDUM RULING

This matter came before the Court for a bench trial on November 15-17, 2010. Plaintiffs Cedric Jackson, et al. ("Jackson") filed suit in February 2009 claiming that Supreme Corporation ("Supreme") negligently installed a rolling-door on a Bossier Parish School Board ("BPSB") delivery truck which lead to Plaintiff's injuries when the door slid down on his head on March 19, 2008. At the time of trial, one defendant remained.[1] Defendant Supreme Corporation appeared at trial. Intervenor Plaintiff School Board of Bossier Parish ("BPSB") also appeared at trial. For the following reasons, the Court finds that judgment shall be rendered in favor of Defendant Supreme Corporation.

---

[1] Defendant Overhead Door Corp., the manufacturer of the rolling-door, was dismissed from this suit on October 1, 2010. See Record Document 67.

## FINDINGS OF FACT[2]

A.  The Claimed March 19, 2008 Accident

Plaintiff, Cedric Jackson, was employed by BPSB on March 19, 2008, as a maintenance employee, assigned to the BPSB Central Warehouse. [Record Document 69, Stipulation 1]. On March 19, 2008, his job duties with the BPSB, included loading and unloading supplies at various school locations from the BPSB Central Warehouse, as well as a driver of the delivery truck at issue. [Record Document 69, Stipulation 2]. In Jackson's petition he claims that on March 19, 2008, "he sustained multiple injuries to his head while loading the truck that he was operating when the loading door slid down hitting him on the head." [Petition for Damages ¶5].

This Court finds that Jackson was diagnosed and treated for bilateral subdural hematomas which treatment included a burr hole evacuation. [Record Document 69, Stipulation 9]. The testimony and documentary evidence demonstrate to this Court that on March 28, 2008, Jackson had his first surgery to relieve a subdural hematoma. [Exhibit 52]. According to his treating physician, an expert in neurosurgery, Dr. Brian Willis, Jackson suffered from a chronic subdural hematoma. Dr. Willis explained to the Court that a chronic subdural hematoma could be anywhere from seven to twenty-one days old. This conclusion was based on the condition of the blood that was evacuated from the hematoma on March 28, 2008. The blood had begun to liquify and the clots had begun to dissolve suggesting the blood had been there for some time. This uncontroverted medical evidence

---

[2]The Court supplements the stipulated facts contained in the pretrial order (Record Document 69) with trial testimony and information from documentary evidence presented during the bench trial of the instant matter.

casts substantial doubt on Jackson's purported chain of events with respect to the claimed on the job accident and injury to his head. Jackson subsequently had two more surgeries to relieve re-accumulated subdural hematomas on April 6, 2008 and May 1, 2008. [Exhibit 52]. Dr. Donald Smith, an expert in the field of neurosurgery, agreed with Dr. Willis' recommendation "for evaluation by neuropsychology and testing by them which will be more definite with regards to the degree of cognitive deficit." [Exhibit 49].

On July 15, 2008, Jackson underwent a neuropsychological evaluation at NeuroRestorative Specialty Services in Tyler, Texas. [Exhibit 51]. Dr. Charles Walker, an expert in the field of neuropsychology, testified in rebuttal that he found that Jackson suffered from severe cognitive dysfunction and recommended a reevaluation in twelve months. Dr. Walker testified that he did not conduct a follow-up after twelve months. Dr. James Pinkston, an expert in neuropsychology from LSU Health Science Center, subsequently evaluated Jackson for cognitive dysfunction on October 23, 2008 and again May 20, 2010. [Exhibit 53]. He testified that both evaluations produced no valid results because, in his opinion, Jackson was actively trying to deceive the tests. In reviewing Dr. Walker's initial assessment and Dr. Pinkston's subsequent neuropsychological assessments, this Court finds that Jackson initially had severe but temporary cognitive dysfunction, which improved to the point that he could actively try to manipulate the subsequent assessments. This Court observed Jackson's demeanor and responses when he testified on November 15, 2010. While at times he appeared to struggle to answer a few questions, this Court is not convinced that Jackson has proved a current cognitive dysfunction. The evidence showed that his mental status was the same before the claimed accident as it was at trial.

Trial testimony clearly showed that Jackson never reported the alleged incident to any of his co-workers or his supervisors. Testimony from Janice Marie Jackson, who became his wife subsequent to the claimed incident, testified that she noticed blood on the top of his head on the day of the incident. She then recounted Jackson's subsequent statement to her that the "damn door came down and hit me on my head." Her sworn testimony is suspect, given that she later testified that she was out of town from March 14th or March 15th until March 24, 2008. This glaring inconsistency and the resulting credibility gap is confirmed by the fact that the medical records provided by Willis-Knighton Bossier Hospital state that a friend brought Jackson to the hospital on March 19, 2008. Jackson told the admitting nurse on March 19, 2008, "I WAS HERE SUNDAY FOR HEADACHE AND NOW ITS [sic] BACK. MY HEAD HAS A LOT OF PRESSURE AND PAIN." [Exhibit 46]. Further on March 22, 2008, he went to the emergency room again and stated that he was by himself because his family was out of town. [Exhibit 46]. This Court finds it noteworthy that neither of these hospital visits mentioned that a rolling-door hit him on his head while on the job. The absence of that information in these medical records is of particular importance in evaluating the Plaintiff's credibility concerning his sworn testimony at trial.

According to the testimony of his doctors, the first mention of this alleged accident occurred about two weeks after the claimed incident occurred, when his doctors were attempting to get a detailed medical history from him. This Court has reviewed all of his primary medical records from Willis-Knighton Bossier Hospital that track Jackson's complaints for about fifteen months from March 16, 2008 until June 23, 2009. [Exhibit 46]. The only references to injuries are a shoulder strain received on March 3, 2008. There is

no mention of the rolling door falling and hitting Jackson on his head until Jackson filed a BPSB Injury/Accident Report on March 31, 2008. [Exhibit 84]. Despite the fact that the incident allegedly occurred at the BPSB Central Warehouse where a co-worker and supervisor ordinarily would be present, evidence produced at trial shows no one witnessed the alleged incident involving Jackson and the rolling door.

Initially, Jackson provided no history to his treating physicians recounting a specific blow to his head. Instead, Jackson advised the emergency room physicians at Willis-Knighton Bossier on March 16, 2008 and again March 19, 2008, that he coughed and developed the headaches. He also related the headaches to a February 22, 2008, work related accident in which he injured his neck and shoulder while lifting heavy furniture.

The testimony of the medical experts revealed that the most prevalent and common symptoms of chronic subdural hematomas are headaches. Based on testimony of Jackson's co-employees and Plaintiff's own medical records, Jackson complained of severe headaches for several months prior to the claimed incident date of March 19, 2008.

The Court heard evidence of several different accounts regarding Jackson's head injury; Dr. Willis testified that he had a recollection that Jackson stated that he pulled the strap and pulled the door down on his head; a co-worker, Ruby Summage, testified that Jackson struck his head in the summer of 2007 on the truck; another co-worker, C.J. Cohn, testified that in November 2007 Jackson struck his head when he quickly raised up while standing in the door opening, forcing him to drop to his knees. None of these versions support Plaintiff's claims of negligence against Supreme. Jackson testified that he has no specific recollection as to the mechanism of injury; however, upon questioning in court, he proceeded to recount details of the accident. From this Court's review of all of the

evidence, the Court finds that these recollections are more consistent and corroborated with an accident occurring in November 2007 at Sun City Elementary School. The Court finds it highly improbable that Jackson could remember specific details of such an apparently devastating head injury. The Court finds that, based on these varying accounts, Jackson has failed to prove that the cause of his head injury was improper installation of the truck's rear loading door by Supreme. In fact, this Court finds that Jackson has failed to prove by a preponderance of the evidence that an accident even occurred on March 19, 2008.

    **B.**    **Claimed Negligence of Supreme Corporation**

The truck at issue was a 2007 International 4300 truck purchased from Twin State Trucks by Bossier Parish School Board on December 12, 2006. [Record Document 69, Stipulation 3]. The rear loading door at issue in this case was manufactured by The Overhead Door Company ("TODCO"). [Record Document 69, Stipulation 4]. The rear loading door for the truck at issue was purchased by Supreme from Overhead Door Corp. and, pursuant to the Purchase Order, shipped on or about October 6, 2006 to the Supreme facility in Cleburne, Texas. [Record Document 69, Stipulation 5]. Supreme manufactured the truck body and installed the TODCO rear loading door on the truck body. [Record Document 69, Stipulation 6]. Supreme sold the truck body to Twin State Trucks pursuant to a Purchase Order dated November 7, 2006. [Record Document 69, Stipulation 7]. Twin State Trucks transported the truck to the Cleburne, Texas facility of Supreme. Supreme then installed the truck body on the truck chassis. The truck was returned to Twin State Trucks who in turn sold the truck to the BPSB. [Record Document 81, Amended Stipulation 8].

From the testimony of Jack McPherson and Timothy Pruitt (the former and current plant managers of the Supreme operation in Cleburne, Texas), Supreme has a thorough understanding of the TODCO products and installs thousands of TODCO doors each year without issue or incident. This Court finds from all of the testimony presented that the rear overhead door was properly installed and properly adjusted by Supreme during final assembly. Supreme installed the rear loading door in accordance with instructions provided by the manufacturer of the door, TODCO. The Court finds and the testimony amply supports that the coiled-spring load formula provided by the manufacturer, TODCO, is merely a starting point and not necessarily the precise and optimum number of turns that are to be placed on the spring for the door to operate properly. In this instance, the entrance of the door was 71 inches high. Using TODCO's formula, the door spring needed approximately 10.1 turns to be properly set. The testimony from Jack McPherson and Timothy Pruitt show that the spring had been wound approximately 9 times. According to the testimony of Jack McPherson and Timothy Pruitt which was corroborated by photographic evidence [Exhibit 131], the spring was initially set to 10 turns but subsequently unwound to 9. The ultimate optimum setting may be over or under one turn different than what is called for in the formula. Testimony established that various things can affect the ultimate number of turns of the spring that may be optimum for a door, such as squareness of the rear frame, dimension of the door, placement of the vertical tracks, and placement of the radius.

The Plaintiffs hired Dr. Jahan Rasty to evaluate the door. The Court accepted him as an expert in general mechanical engineering. However, this Court notes that he is only a general expert in the field of mechanical engineering. He has never designed, installed

or worked on a case involving a rolling door. Nonetheless, he testified that the door was not properly installed by Supreme. The Court is not persuaded by his testimony.

Testimony at trial demonstrated that the loading dock at the BPSB Central Warehouse was at an incline that had the front of the truck higher than the rear of the truck. Several witnesses who worked for the BPSB testified that the door hung anywhere from 2 to 12 inches when opened. Jack McPherson and Timothy Pruitt explained that the rear loading door is installed and calibrated on a level surface, and if the truck is parked on an incline, gravity will actually pull the door down a bit. This Court therefore finds that even a properly installed door will hang lower while the truck is parked on an incline.

According to testimony at trial, from the time of delivery of the fully assembled unit until notice was given of claims being made by Jackson, Supreme received no notice from anyone of any problems related to the operation of the rear loading door and was never called upon to adjust the door's mechanism or perform maintenance with respect to the door. According to Jeff Ipsom, who was the BPSB Central Warehouse manager at the time of the alleged incident, he never made or requested that Supreme perform any adjustment to the spring mechanism of the door.

According to Timothy Pruitt's testimony, the typical position of a properly installed TODCO door is for the door to hang, at rest, a few inches into the opening. This is by design; the door is not designed to remain in the header area. Ultimately, a properly installed door is one which, when raised, will remain in any position it may be placed along the vertical track.

A sign on the door provides that repairs are to be made by authorized service personnel. Warnings on the door clearly state that a moving door can cause serious injury

or death and that a person should stand clear of the opening while the door is moving. [Exhibit 110]. A warning on the door further cautions that an operator is not to use the pull strap on the door to help get in or out of the truck. [Exhibit 110].

Jackson has failed to prove, more probably than not, that his head injury was caused by an incident involving the rear loading door on March 19, 2008. The testimony demonstrates that at the time of inspection and subsequent to the alleged incident, the rear loading door only begins to fall gradually when the door is approximately 24 inches into the 71-inch opening, or approximately 47 inches from being closed. Jackson is 5'10" tall. The Court finds that in order for the door to have fallen and struck Jackson on the head, he would have been positioned below the height of 47 inches. Further complicating matters, Jackson made no complaint to his co-workers or his supervisors that the rear loading door had fallen and struck his head or of any incident in 2008 involving the rear loading door.

The Court finds that the rear loading door did not "free fall" and strike Jackson on the head as alleged by Plaintiff and as assumed by Plaintiffs' expert, Dr. Rasty. Most telling to the Court was the video of Timothy Pruitt jumping up and down on the rear ledge of the truck to demonstrate how much force is actually needed to get the door to move down. [Exhibit 72]. According to that video, even when the door is coming down on its own it is not in "free fall," instead it is merely inching its way down.

The testimony of Jackson and his work colleague C.J. Cohn show that they complained about the door to BPSB Central Warehouse personnel and its functioning a year or so after it was sold and delivered to the BPSB. When Timothy Pruitt inspected the truck in preparation for this trial, he testified that the spring appeared to have not been oiled

and a hinge was "busted." Defendant's expert in mechanical engineering, Johnie Spruiell[3], corroborated this observation when his expert report and testimony both concluded that the door had never received any maintenance by the owner, BPSB or anyone else. No evidence was produced at trial that suggested that the BPSB ever performed maintenance on the door or requested maintenance or repair service from Supreme. This Court finds that BPSB failed to take appropriate corrective action to inspect, repair and/or adjust the rear loading door after receiving complaints from the warehouse employees.

As of November 12, 2010, BPSB paid to and/or paid on for the benefit of Cedric Jackson, Sr., the sum of $225,352.52 in medical benefits and the sum of $43,392.70 in wage indemnity benefits. Supreme disputes that the payments are in any way related to an incident involving the rear loading door. [Exhibit 91A]. This Court agrees that medical and indemnity payments made by BPSB to or on behalf of Cedric Jackson, Sr. are not related or connected in any way to the claimed but unproved incident of March 19, 2008.

## CONCLUSIONS OF LAW

On March 13, 2009 this matter was removed from the 26th Judicial District Court in Bossier Parish. [Record Document 1]. The events at issues in this case all occurred in Louisiana and the Court's subject matter jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Thus, Louisiana substantive law applies to the instant matter. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938); Batts v. Tow-Motor Forklift Co., 66 F. 3d 743, 750 (5th Cir. 1995).

---

[3]This Court notes that unlike Plaintiffs' expert in mechanical engineering, Johnie Spruiell is not a general expert of mechanical engineering. His work focuses specifically on failure analysis.

### A. The Claimed March 19, 2008 Accident

Louisiana law has no general test in the tort area for determining if an accident actually occurred. However, the Louisiana Supreme Court has adopted a test in workmen's compensation cases for determining if an unwitnessed work-related injury occurred. While this test is not binding in this tort setting, this Court finds it to be a useful tool in analyzing this present scenario because this Court has found that an accident involving Plaintiff did not occur on March 19, 2008 as alleged. According to the Louisiana Supreme Court in Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992):

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); MALONE AND JOHNSON, 13 Louisiana Civil Law Treatise, Workers' Compensation, § 253 (2d Ed.1980).

Bruno further provides that corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses, friends, or medical evidence. Id.

This Court finds that varying accounts and contradictions surrounding previous injuries, symptoms and medical treatment before the occurrence of the claimed accident, as well as the fact that the accident at issue was not reported to Plaintiff's employer until two weeks later, all serve to cast serious doubt on Jackson's credibility and testimony regarding the sequence of events. In addition, this Court finds that the circumstances simply do not corroborate Jackson's testimony. Even using the employee-oriented test above, this Court finds that Jackson has failed to carry his burden of persuasion to prove by a preponderance of the evidence that an accident occurred. His own medical history

11 of 14

contains no complaint regarding a March 19, 2008 incident. However, out of an abundance of caution and for purposes of analysis only, this Court will assume an "accident" occurred on March 19, 2008.

### B. Claimed Negligence of Supreme Corporation

Articles 2315 and 2316 of the Louisiana Civil Code provide that every person is responsible for the damages caused by his fault and/or negligence. See LA. C.C. Arts. 2315(A), 2316. In order to determine whether liability exists under these provisions, Louisiana courts employ a "duty-risk" analysis which takes into account the particular facts of each case and the conduct of each individual party. Pitre v. Louisiana Tech Univ., 673 So.2d 585, 589(La.), cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996); Socorro v. City of New Orleans, 579 So.2d 931, 938 (La. 1991). This analysis includes five relevant inquiries: (1) whether the duty was a cause-in-fact of the resulting harm (the "causation" element); (2) whether the defendant had a duty to conform his conduct to a specific standard (the "duty" element); (3) whether the defendant failed to conform to the appropriate standard (the "breach" element); (4) whether the risk, and the harm caused, were within the scope of protection afforded by the duty breached (the "scope of duty" element); and (5) whether the plaintiff sustained actual damages (the "damages" element). Id.

"The plaintiff has the burden of proving every element of his cause of action and ... negligence is never presumed." Pool v. Missouri Pacific Railroad Company, 541 So.2d 969, 975 (La.App.2d Cir.), writ denied, 543 So.2d 10 (La.1989).

Louisiana appellate courts have held:

> The plaintiff seeking damages in a civil action must prove each element of his claim by a preponderance of the evidence. Alderman v. Jacks, 31,572 (La.App.2d Cir.2/24/99), 729 So.2d 729; Cox v. Total Petroleum, Inc., 29,496 (La.App.2d Cir.5/7/97), 694 So.2d 619. Proof by preponderance of the evidence means that the evidence, when taken as a whole, shows that the fact to be proven is more probable than not. Cox, supra. If the party bearing the burden of proof fails to satisfy his burden by a preponderance of the evidence, his case fails to outweigh his opponent's case and he necessarily loses. Miller v. Leonard, 588 So.2d 79 (La.1991); Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418.

Erwin v. State Farm Mut. Auto. Ins. Co., 771 So.2d 229, 232 (La.App.2d Cir. 11/1/00).

An analysis of negligence necessarily requires an initial negligent act on the part of the alleged tortfeasor. In this instance, Jackson accuses Supreme of negligently installing the rolling door. Jackson has utterly failed to even prove by a preponderance of the evidence a negligent act on the part of Supreme. The testimony and evidence introduced at trial overwhelming prove that the door was in fact properly installed. Since there is no evidence of a negligent act by Supreme, the duty/risk analysis stops at this point. Without a negligent act there can be no liability.

### C. Loss of Consortium

Finally, the Plaintiffs were married on May 18, 2008. In Louisiana, to maintain a loss of consortium claim, the plaintiff must be a member of a specific class, such as a spouse. LA.C. C. Art. 2315.2. The jurisprudence in this state has held that injuries sustained prior to marriage cannot form the basis of a loss of consortium claim because one cannot marry into a cause of action. See Leckelt v. Eunice Superette, Inc., 555 So.2d 11 (La.App. 3rd Cir.1989); Nunez v. Canik, 576 So.2d 1080 (La.App. 3d Cir.1991); Herndon v. Southwestern Electric Power Company, 655 So.2d 678 (La.App.2d Cir.1995). Morales v.

13 of 14

Davis Brothers Construction Company, Inc., 706 So.2d 1048, 1051 (La.1998). One case carved a narrow exception to this rule and allowed recovery for loss of consortium when the original act occurred prior to marriage and the damage was not discovered until afterward. Aldredge v. Whitney, 591 So.2d 1201, 1205 (La.App.2d Cir.1991). Plaintiffs do not contend, however, that Jackson's injuries were discovered after the wedding; therefore, this exception does not apply. Janice Marie Jackson is not entitled to any damages for loss of consortium.

Plaintiffs have failed to meet their burden of establishing by a preponderance of the evidence that an accident even occurred on March 19, 2008. Assuming *arguendo*, an accident occurred, Jackson has failed to meet his burden of establishing by a preponderance of the evidence that Supreme committed a negligent act. Accordingly, all of Plaintiffs' claims against Supreme are dismissed with prejudice and judgment is rendered in favor of Supreme.

## CONCLUSION

Based on the foregoing, judgment is hereby rendered in favor of Supreme and all of Cedric Jackson, et al.'s claims against this Defendant are dismissed with prejudice.

A Judgment consistent with this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 21st day of January, 2011.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE